THOMAS MCQUADE v. TOWN OF ASHFORD ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, JS.

Argued December 8—decided January 13, 1944.

*Jacob Berman,* for the appellant (plaintiff).

*Harold K. Watrous,* with whom, on the brief, was *Daniel G. Campion,* for the appellees (defendants).

BROWN, J. The plaintiff claimed that on June 30, 1941, he suffered an injury to his heart, ultimately causing paralysis, as a result of preparing and firing a blast while engaged in road work in the employ of the defendant town. The compensation commissioner concluded that neither this work nor the firing of the blast was a material factor in causing the plaintiff's disability and denied his claim for compensation. The plaintiff made a motion to correct the finding. The commissioner denied the motion on the ground that the corrections, even if all of them were made, would not change his conclusions. This ruling was assigned as a reason of appeal to the Superior Court. The appeal was dismissed, and an appeal was taken to this court. The vital question upon this appeal is whether the commissioner erred in denying the motion to correct on the ground stated.

The material facts found by the commissioner were the following: On June 30, 1941, the plaintiff was the first selectman of the defendant town. The plaintiff's duties on road work as selectman involved occasional blasting with dynamite. On June 29, he dynamited a ledge without mishap and on the following day proceeded to blast the ledge, where his injury is claimed to have been incurred. He carried the dynamite, weighing about forty pounds, up a seven-foot incline, placed the charge in the holes prepared and connected it with wire leading to his truck, parked two hundred and seventy-five feet away. He then walked back to the truck, connected the other end of the wire with its battery and by means of the starter-

switch set off the charge. Shortly after the blast he slumped to the ground with considerable pain in his chest and difficulty in breathing. A few minutes later fellow workmen found him near the truck looking very ill and complaining of his heart. He was able to walk. At his request he was taken to the office of Dr. Carter, who prescribed some pills and sent him home to rest. The plaintiff rested in bed for the remainder of the day, but commencing the next day stayed on the job at his office for a week or more with the aid of his sister, who drove him back and forth and did the actual office work under his direction. Thereafter he remained at home for several weeks and on July 30, his condition not having improved, went to the Lahey Clinic in Boston where he remained for three weeks for observation and treatment. While in bed at the clinic an embolus or blood clot lodged in his brain resulting in a partial paralysis.

Prior to June 30 the plaintiff had a history of rheumatic heart disease. He had twice been hospitalized in May, 1941, for attacks similar to the one of June 30, and the hospital findings indicate that he had rheumatic heart disease with a mitral valvular lesion and two to one heart block at that time. Later an additional diagnosis was made of auricular fibrillation. In the latter condition the auricles of the heart become motionless after dilating slightly, instead of contracting seventy or eighty times per minute as is normally the case. As a result, in practically all cases blood clots or mural thrombi form along the inner walls of the auricles. In a very high percentage of cases of auricular fibrillation, small portions of the blood clots are broken off and thrown into the systemic circulation. Such a clot may lodge in any organ of the body, and when it goes to the brain, as it often does, a partial or complete paralysis of a certain por-

tion of the body results. This condition of embolism occurs in a high percentage of all patients with auricular fibrillation, whether they are at work or at rest or asleep, and so far as is known it has no relation to occupation or work. The plaintiff's embolus did not result from any accident or injury arising out of and in the course of his employment but was something that resulted from his heart disease. The blast did not produce a state of shock in the plaintiff causing injury to his heart and brain.

The vital contested issue before the commissioner was whether the blast in conjunction with the plaintiff's activities in preparation for it, hereinafter referred to as the accident, caused his paralysis and so entitled him to compensation. The expert witnesses on both sides were in agreement that there was an auricular fibrillation of the plaintiff's heart which gave rise to the embolism and consequent paralysis. The plaintiff's two experts testified that in their opinion the accident caused an injury to his rheumatic heart and so produced the auricular fibrillation with the consequent embolism and paralysis. The defendant's two experts upon heart disease, Dr. Marvin and Dr. Backer, expressed the opinion that the accident bore no causal relation to the plaintiff's subsequent condition. The commissioner's finding makes clear that his vital conclusion that the plaintiff's embolus resulted from pre-existing heart disease and not from the accident was based upon the testimony of these two witnesses. An apparent conflict in the testimony of Dr. Marvin is the basis of a claim by the plaintiff that his opinion was predicated upon the assumption that the auricular fibrillation existed prior to the accident. That of Dr. Backer indicates that his opinion was based upon the assumption that no facts appeared to show an injury to the plaintiff's heart by the accident

at the time. The plaintiff's witnesses, Dr. Steincrohn, an expert on diseases of the heart, and Dr. Gosselin, a specialist in nervous and mental diseases, testified that in their opinion the facts did show an immediate injury to the plaintiff's heart and that this and not his pre-existing heart disease was the cause of the embolus which ensued. The situation so presented indicates the potential significance of the corrections in the finding sought by the plaintiff to which we refer below.

The commissioner, in denying this motion, which asked a total of fifteen corrections, stated as the reason for his ruling that all of these if granted would not change his conclusion. The finding in a compensation case "should contain all the subordinate facts which are pertinent to the inquiry, and the conclusions of the commissioner therefrom. . . . If a finding does not conform to these requirements, . . . neither the Superior Court nor this court is in a position to decide whether the award was correct and just or not." *Rossi* v. *Jackson Co.,* 117 Conn. 603, 605, 169 Atl. 617. "To refuse to find the facts which a party seeks to have stated because the commissioner deems them unnecessary or immaterial is not ordinarily fair to the parties, the court or the State and its officers. It is not fair to the parties because they are entitled to have found such proven facts as they deem it necessary to present to the court upon the appeal." *Senzamici* v. *Waterbury Castings Co.,* 115 Conn. 446, 450, 161 Atl. 860. See also *Kenyon* v. *Swift Service Corporation,* 121 Conn. 274, 279, 184 Atl. 643. "Cases under the Workmen's Compensation Act are upon a different basis from actions between ordinary litigants. No case under this Act should be finally determined when the trial court, or this court, is of the opinion that, through inadvertence, or otherwise, the facts have not been sufficiently found to render a just judgment. When

this appears, the case must be returned to the commissioner for a finding in accordance with the suggestions made by the trial court or this court, and for an award to be made upon the corrected finding." *Cormican* v. *McMahon*, 102 Conn. 234, 238, 128 Atl. 709. The reason given by the commissioner for refusing the corrections asked requires that the facts contained therein, particularly where as here the evidence is sufficient to support them, be assumed true by this court in applying the above principles.

A recital of the facts most significant upon the crucial issue of causation, without mention of other material facts which the plaintiff by his motion asked be deleted or added, is sufficient to demonstrate that the commissioner's ruling was unwarranted. These may be thus summarized: The accident involved far greater exertion by the plaintiff and heavier concussion from the blast than did the dynamiting of the preceding day. This exertion included his carrying the forty pounds of dynamite for two hundred feet up a soft-surfaced steep grade prior to ascending the seven-foot incline of the ledge itself. When the plaintiff slumped to the ground immediately after the blast, he was in an agony of pain, his heart was beating fast and he was white and perspiring. These facts indicated a collapse and impairment of heart function at that time. Although the plaintiff had a rheumatic heart prior to the accident, he had never before had an attack similar to this, nor had he ever been incapacitated for work or other activity, his heart condition not being one to produce an effect of this nature. His disability really began at the moment of the blast and has continued ever since. An accident of this nature may produce impaired heart functioning and auricular fibrillation. Prior to June 30 the plaintiff did not suffer from auricular fibrillation, but this did develop

shortly after the accident and subsequently produced the embolism. This may occur either soon or as long as months after the fibrillation develops. The plaintiff's efforts incident to the accident constituted overexertion which, together with the excitement and noise of the explosion, injured his heart, intensely aggravating its pre-existing rheumatic condition, and as a result the auricular fibrillation developed. One of the facts upon which Dr. Backer based his opinion that the accident did not cause injury to the plaintiff's heart was that he had no rapid heart action at that time. Soon after the accident, the plaintiff's heart, which before had been regular, showed occasional irregularity but no fibrillation. The history of this occasional irregularity, first appearing as it did after the plaintiff's rapid heart action at the time of the accident, afforded reasonable evidence that a condition of auricular fibrillation was developing.

Obviously, all of these facts are material to the commissioner's conclusion that the accident did not cause the plaintiff's injury. A finding by him of some or all of them might so seriously affect the weight to be given to the opinions of the experts as to establish that this conclusion was unwarranted. *Driscoll* v. *Jewell Belting Co.*, 96 Conn. 295, 299, 114 Atl. 109. Therefore, the trial court should have returned the case to the commissioner with a direction to correct the finding by adding such of those facts contained in the plaintiff's motion to correct as he found to be either undisputed or established upon conflicting evidence.

There is error, the judgment is set aside and the case is remanded with direction to return it to the commissioner to rule upon the plaintiff's motion to correct the finding in accordance with this opinion.

In this opinion the other judges concurred.